# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

KEVIN FISHER,

                                          Plaintiff,

    vs.                                                   9:16-CV-1175 (GTS/ATB)

SUPERINTENDENT MILLER, et al.,

                                          Defendants.

KEVIN FISHER, Plaintiff pro se
BRIAN W. MATULA, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants failed to properly use the metal detector to screen inmates going into the yard at Great Meadow Correctional Facility ("GMCF"), resulting in injury to plaintiff at the hands of another inmate. (Complaint ("Compl.") generally) (Dkt. No. 1). Plaintiff seeks substantial monetary relief. (Compl. ¶ 8).

    On December 5, 2016, defendants made a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 10). On January 11, 2017, I issued a Report and Recommendation, recommending that the motion be granted in part, and denied in part. (Dkt. No. 15). I recommended dismissing plaintiff's allegations of negligence, but recommended denying the portion of defendants' Rule 12(b)(6) motion which argued for dismissal based upon plaintiff's failure to exhaust his administrative remedies as well as the portion of the defendants' motion which argued for dismissal on

the merits of the failure to protect claim. (Dkt. No. 15 at 5-10 (exhaustion); 10-16 (failure to protect); 15-16 (negligence)). On February 9, 2017, my Report and Recommendation was adopted in its entirety by the Honorable Glenn T. Suddaby, Chief District Court Judge. (Dkt. No. 17).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 38). Plaintiff has responded in opposition to the motion. (Dkt. No. 42). Defendants have filed a reply. (Dkt. No. 43). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

**I.   Facts**

I reviewed plaintiff's recitation of the facts in my January 11, 2017 Report and Recommendation. (Dkt. No. 15 at 2-13). I will repeat them herein for clarity, and will make reference to the additional facts and evidence submitted in support of the motion for summary judgment in my analysis below.

In his complaint, plaintiff alleges that on September 29, 2015, at approximately 12:50 p.m., he was in the yard at GMCF. (Compl. ¶ 6). Plaintiff had obtained a pass to leave the yard in order to get his medication. As he was leaving the yard, he walked past a group of inmates and felt someone "punch" him in the back of his head. (*Id.*) Plaintiff alleges that he kept walking, and when he was inside the building, showing his pass to a sergeant, the officer asked plaintiff what happened to him. The sergeant told plaintiff to face the wall and noticed that plaintiff was bleeding. He asked plaintiff who cut him, but plaintiff stated that he did not know. (*Id.*) Plaintiff was taken to the

medical department where it was determined that plaintiff had suffered a four inch cut on the back of his head and a one eighth inch cut on his right ear, which required a total of twelve stitches. (*Id.*)

The complaint contains six "Causes of Action ("COAs")," but essentially, plaintiff claims that the defendants - Superintendent Miller and Superintendent of Security Eastman - failed to see that the metal detector outside the yard was properly used, which allowed inmates to bring weapons into the yard. (Compl. ¶ 7). The COAs also contain additional facts.[1] (*Id.*) Plaintiff alleges that the defendants created a "foreseeable" risk, and were deliberately indifferent to that risk, because they were aware that not all of the inmates were being screened through the metal detector prior to entering the yard, and they did nothing to stop this conduct by their subordinates. (COAs #1-3).

Plaintiff's fourth COA includes the additional facts that the "evening" inmates are all made to go through the metal detector, while the morning and the noon groups are not all screened. (COA #4). Plaintiff implies that this shows that defendants are aware of the risk that inmates will carry weapons into the yard if they are not properly screened. The fifth COA repeats the allegation of defendants' deliberate indifference. (COA #5). Finally, plaintiff claims that defendants attempted to cover up their "negligence" by claiming that plaintiff was in a physical altercation with another inmate

---

[1] As is the case in many pro se pleadings, the plaintiff may confuse causes of action with factual statements in support of the causes of action. The court must read plaintiff's pleadings liberally to raise the strongest arguments they suggest, including reading the causes of action to determine whether additional facts are stated therein which may support plaintiff's ultimate claims. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

and charging him with misbehavior. However, plaintiff was found "not guilty" of fighting after his disciplinary hearing. Plaintiff was placed in Involuntary Protective Custody ("IPC") after refusing voluntary placement. (Compl. COA # 6).

Although the complaint contains six "causes of action," essentially plaintiff's constitutional claim is that the defendants failed to protect him from the substantial risk that he would be attacked in the "big yard" because of the method by which the inmates were screened prior to entering the yard. Plaintiff claims that the metal detector was not used on a consistent basis allowing weapons to be smuggled into the yard and used to harm other inmates.

## II. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving

4

party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

In his opposition papers, plaintiff argues that the legal standard for deciding this summary judgment motion should be the same standard as the court uses for a motion to dismiss under Rule 12(b)(6). Plaintiff cites cases, holding that judges may dismiss a case for failure to state a claim, even though the defendants made a motion for summary judgment. (Dkt. No. 42 at 3) (citing *Schwartz v. Companie General Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968); *Tafari v. McCarthy*, 714 F. Supp. 2d 317 (N.D.N.Y. 2010)).

*Schwartz* and *Tafari* stand for the proposition that even when defendants make a motion for summary judgment, but the court relies **only on the plaintiff's pleadings** in dismissing the action, "such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Tafari*, 714 F. Supp. 2d at 338. These cases hold that when the court dismisses on the pleadings alone, the standard for deciding the motion is the same as when the court dismisses for failure to state a claim, which requires that the plaintiff's facts are accepted as true, that

the claim be "plausible on its face" and that all reasonable inferences be drawn in the plaintiff's favor. *Id.* (citing *Schwartz*, *supra*).

While plaintiff's analysis of the cases he cites is generally correct, the cases do not apply here. This court has already recommended denying a motion to dismiss filed by defendants, which was adopted by the District Judge. There has been discovery in this action, and defendants have supported their motion for summary judgment with additional documents, including plaintiff's deposition. (Dkt. No. 38-1 - 38-8). Plaintiff was given a substantial number of documents in discovery. Even though he has not attached these documents, he has referred to them in his memorandum of law in opposition to defendants' summary judgment motion. (*See* Dkt. No. 42 at 5). As such, the court is not relying "solely" upon plaintiff's complaint, and the proper standard is the one for summary judgment, discussed above.

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for

complaints of harassment. *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321 at *2.

8

**B.     Application**

Defendants argue that plaintiff has failed to exhaust his administrative remedies with respect to the issue of the inconsistent use of metal detectors at the entrance to the Big Yard. Defendants made the identical argument in their motion to dismiss, and this court found based upon documents that were included with the pleadings, that plaintiff had exhausted his remedies. While this is a motion for summary judgment, and as discussed above, the standard is different than in a motion to dismiss, the documents reviewed by the court, relative to the exhaustion issue, in the motion to dismiss were identical to the documents relied upon by defendants' in support of their summary judgment motion.

Chief Judge Suddaby adopted my Report and Recommendation. To the extent that the defendants' argument can be considered a request to reconsider this court's determination, I have no jurisdiction to reconsider the order adopting my Report and Recommendation and would decline to do so even if I had the authority.[2]

---

[2] Defendants argue that because plaintiff did not raise his challenge to the inconsistent use of the metal detector until his appeal to the CORC, he did not properly raise the issue that the raises in this case. Plaintiff is raising a claim of "failure to protect." In his grievance, he stated that it was the security staff's "fault for not checking inmates coming to this yard with razors." (Dkt. No. 38-5 at 1). Since there is a metal detector at the entrance of the yard, if the officers were "not checking" inmates for weapons, it is likely that they were not using the metal detector. The officer who investigated plaintiff's grievance stated in his report that "Inmates are run through a metal detector and pat frisked during yard runs. There is no way to ensure that there will not be any fighting between inmates in the yard without a complete lockdown [sic] of the facility." (Dkt. No. 38-5 at 3). The IGRC denied plaintiff's grievance, and plaintiff appealed to the Superintendent, who affirmed the finding, stating that inmates were passed through a "frisker" and subjected to random pat frisks. (Dkt. No. 38-5 at 5). In plaintiff's appeal of the Superintendent's decision, he included the statement that only the first few companies were required to go through the frisker, allowing other inmates to enter the yard with weapons. Defendants argue that because plaintiff waited until his appeal to the CORC to raise this argument, the claim unexhausted. However, plaintiff may have been opposing the investigator's implied finding that "everyone" was required to go through the metal detector. The CORC decision

## IV. Failure to Protect

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff satisfy an "objective" and a "subjective" test. *Jolly v. Coughlin*, 76 F.2d 468, 480 (2d Cir. 1996). Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm (objective), **and** prison officials acted with deliberate indifference to that risk and the inmate's safety (subjective). *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

Where the plaintiff alleges a constitutional violation based upon dangerous general prison conditions, he must demonstrate "'a substantial risk of inmate attacks [which were] longstanding, pervasive, well-documented, or expressly noted by prison

---

upheld the Superintendent, and repeated the investigator's findings about the metal detector and the random frisks. (Dkt. No. 38-5 at 6). The CORC decision ended with the statement that "[w]ith respect to the grievant's appeal, CORC finds insufficient evidence of malfeasance by staff and advises him to address safety and security matters to area supervisory staff at the time of incident for any remedial action. This court finds that the issue was fully investigated. Plaintiff's statement to the CORC that some of the inmates were required to go through the metal detector and some were not may be interpreted as his explanation of his initial grievance which stated that the officers were not "checking" certain inmates who were entering the yard. This is supported by plaintiff's testimony during his deposition. Plaintiff was explaining his grievance to defense counsel and stated that "if you don't go through the metal detector, you are not being checked." (Pl.'s Dep. at 71-72). In their reply (Dkt. No. 43), defendants oppose plaintiff's argument that he is entitled to the "special circumstances" exception to exhaustion. Defendants are correct that *Ross, supra* eliminated the special circumstances exception. As stated herein, this court is not relying on such an exception to find that plaintiff exhausted his remedies.

officials . . . and that the officials being sued were exposed to information concerning the risk and thus, must have known about it.'" *Sullivan v. Graham*, No. 9:09-CV-1311, 2011 WL 4424355, at *6 (N.D.N.Y. Aug. 6, 2011), *Rep't Rec. adopted*, 2011 WL 4424350 (N.D.N.Y. Sept. 21, 2011) (quoting *Madison v. Hoey*, No. 9:03-CV-749, 2009 WL 818956, at *8 (N.D.N.Y. Mar. 26, 2009) (citations omitted)). The court must analyze the case both as it relates to a specific danger as well as a danger to the inmate population in general.[3] *Id.*

### B. Application

In their motion to dismiss for failure to state a claim, defendants argued that plaintiff had failed to demonstrate that the defendants were liable for failure to protect. I recommended denying the motion to dismiss because plaintiff made sufficient allegations of risk and deliberate indifference to survive the motion to dismiss on the pleadings. I noted that "[w]hile the ultimate resolution of plaintiff's claim is far from clear, at this stage of the case, with no discovery, and taking into account the requirement that the court accept plaintiff's allegations as true, this court will not recommend dismissing the action based on the complaint alone." (Dkt. No. 15 at 16). Defendants now renew their argument, based on additional discovery, including plaintiff's deposition.

### 1. Specific Danger

There is clearly no evidence that the defendants, who are the Superintendent and

---

[3] This danger is distinguishable from a the "general" risk that inmates encounter simply by being incarcerated. *See Garcia v. Witkowski*, 988 F. Supp. 2d 360, 362-63 (W.D.N.Y. 2013) (knowledge that prisoners might be attacked in the yard with weapons was insufficient to allege more than negligence against the defendants).

11

the Deputy Superintendent for Security, knew of a specific risk to plaintiff. Plaintiff himself was not aware of any risk. In fact, plaintiff never knew who allegedly cut him, and no weapon was ever recovered. Plaintiff states that he felt someone "punch" him in the head, but thought nothing of it until an officer pointed out to him that he was bleeding. At his deposition, plaintiff testified that he was not afraid of anyone prior to the incident, was not afraid to go to the big yard after the incident, and he refused voluntary protective custody after the incident. (Pl.'s Dep. at 47-48). If plaintiff was unaware of a specific risk, substantial or otherwise, it is unlikely that either one of the supervisory defendants would have been aware of such a risk, or that either one was deliberately indifferent to such a risk.

    **2.**    **General Danger**

Plaintiff states that the discovery provided by defendants consisted of "a voluminous and exhaustive package of unusual incident reports dating back from 2015 to 2016." (Dkt. No. 42 at 5). Plaintiff states that based on this information "as evidenced by the unusual incident reports, numerous cuttings and stabbings continued to occur because prison officials neglected to take reasonable measures (i.e., to install metal detectors in the recreation yards and increase the number of security staff to patrol the yard),[4] to guarantee the safety of inmates in their custody . . . ." (*Id.*) Plaintiff has not attached any of the relevant discovery documents to his response because this court directed that he not make copies of the documents due to security concerns. (Dkt.

---

[4] The court notes that plaintiff states that defendants should have "installed" metal detectors. Plaintiff's claim in this case is not that the yard lacks metal detectors, it is that the existing metal detectors are not being used at certain times of the day, and that the staff who are in charge of operating the metal detectors go to other posts, leaving no staff to run the metal detector.

12

No. 35).

Although neither plaintiff nor defendants have filed the discovery documents in question in support of or in opposition to the summary judgment motion, the court will consider that plaintiff has incorporated the documents by reference and will consider the redacted documents as part of the record in this case.[5]  Based on a review of the records, the court accepts the plaintiff's statement that there were numerous incidents of violence in the Big Yard at GMCF in the eight months prior to the incident involving plaintiff.

In the documents provided to plaintiff it appears that there were approximately 29 incidents where cutting or slashing was mentioned in the eight months prior to the incident in this case.  However, there were only nine incidents in which the weapon was actually recovered.  Thus, the court assumes that a substantial risk exists, based on the number of incidents where "slashing" was noted[6] on the record.  The question becomes whether the two named supervisory defendants were "deliberately indifferent" to that

---

[5] In my Text Order, dated January 2, 2018, after reviewing the records *in camera*, I directed defense counsel to file the documents that they provided to plaintiff, "to the extent the plaintiff states that he needs to reference the documents in filings with the court." (Dkt. No. 35).  Defendants did not comply with my order, and I will thus order the Clerk to file the documents under seal so that they may be a part of the record and may be considered in the motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(3) (The court is only "required" to consider cited materials, but has the discretion to consider other materials in the record). *See also Corso v. Fischer*, 983 F. Supp. 2d 320, 324 (S.D.N.Y. 2013) (court's decision of the summary judgment motion was based upon Local Rul 56.1 statements, supporting materials, "and other evidence in the record from previous stages of litigation . . . .")

[6] In *Sullivan*, the court found that 33 attacks in the thirty months prior to the plaintiff's incident were sufficient to establish the requisite "history" of inmate-on-inmate violence giving notice to prison officials of the danger to inmates from such attacks. 2011 WL 4424355 at *8.  In *Warren v. Goord ("Warren II")*, 579 F. Supp. 2d 488, 496 (S.D.N.Y. 2008), the court found that 37 attacks in a four-year period was sufficient to establish notice of a substantial risk. *Id.* (citing *Warren II*, 579 F. Supp. 2d at 495-96).

risk. In order to act with deliberate indifference, the defendants must have disregarded the risk by failing to take reasonable measures to abate it. *Sullivan v. Graham*, 2011 WL 4424355 at *8 (citing *Warren II*, 579 F. Supp. 2d at 496). To prevail, "'plaintiff must show that the defendants had the ability to take some reasonable action that would have significantly alleviated the risk yet failed to do so." *Id.* (quoting *Warren II, supra*).

In this case, plaintiff concedes that there is a metal detector, also known as a "frisker" in place at the yard entrance, but that the morning and afternoon companies are not run through the metal detector consistently. Plaintiff claims that the inmates who go to the yard in the morning are required to pass through the metal detector, but by the time the inmates come for their afternoon recreation, they are not required to go through the metal detector because the officers have left for other "posts." The "evening" inmates are required to go through the metal detector. Plaintiff claims that the inmates are aware of this procedure and use this opportunity to bring weapons into the yard, creating a substantial risk to all inmates who use the yard. (Compl. at 5-7). Plaintiff does not propose a "solution," but his complaint may be read to suggest that these attacks would not have happened if the prison officials used the metal detector consistently.

As an exhibit, defendants have filed the DOCCS Directive No. 4910, governing "Control and Search for Contraband." (Def.s' Ex. B). This directive contains the rules for all forms of searches, including "Metal Detector Search[s]" and "Pat Frisks." A metal detector search is only "mandatory" in certain circumstances, which do not include going into the yard. Directive No. 4910(A)(2)(1)-(A)(2)(6). Subsection b states

14

that an inmate "may" be subjected to a metal detector search in various other circumstances. Directive No. 4910(A)(2)(b)(1)-(A)(2)(b)(5). Those circumstances include: "(1) Going to and from work, housing, and program areas." Directive No. 4910(A)(2)(b)(1). The final situation in which an inmate may be subjected to such a search is "[a]s directed or authorized by supervisory staff." *Id.* No. 4910(A)(2)(b)(5). It is clear that going to and from the yard is a situation in which passing through the metal detector is discretionary.[7]

Plaintiff testified at his deposition that, on the day of the incident, he was simply walking through the Big Yard when he felt someone "punch" him on the back of the head, but he did not see who attacked him or even know he had been cut until the Sergeant told him he was bleeding. (Pl.'s Dep. at 34, 35, 37, 53, 55). No weapon was ever recovered after the incident. Thus, there is no evidence that the weapon used to injure plaintiff was metal. Plaintiff did not know who brought the weapon into the yard, when it was brought into the yard, or how long the weapon had been in the yard prior to the "weapon" being used against plaintiff. (Pl.'s Dep. at 53). Despite the attack, plaintiff testified that he felt safe in the facility and, particularly, in the Big Yard. (Pl.'s Dep. at 48). He refused voluntary protective custody after the incident. (Pl.'s Dep. at 47-48; Def.s' Ex. C).

Plaintiff acknowledged that there were metal detectors at the entrance to the yard, and that when the inmates left their cells to go to the mess hall and to recreation, they

---

[7] Although not determinative of a constitutional claim, the court would point out that prison officials were not violating any DOCCS policy by failing to use the metal detectors at all times for inmates who were going into the Big Yard.

did not know whether they would be going through the metal detector or not.[8] (Pl.'s Dep. at 59-60). Plaintiff also testified that he did not know when the officers left the metal detector to go to other posts, but he estimated that inmates who left their cells shortly before noon would not have to pass through the metal detector.[9] (Pl.'s Dep. at 65). Plaintiff was also aware that in addition to metal detectors, officers used pat frisks to detect weapons, and that officers were posted in the Big Yard to observe the inmates for security. (Pl.'s Dep. at 27).

Plaintiff also acknowledged that metal weapons could be smuggled through the metal detector by "cheeking" them, which meant wrapping the object in electrical tape and placing it between the "cheeks" of the inmate's buttocks. (Pl.'s Dep. at 63). Plaintiff testified that he saw several inmates smuggle weapons through the metal detector into the yard, but never alerted prison officials, anonymously or otherwise. (Pl.'s Dep. at 61, 71). Plaintiff stated that it was "none of [his] business." (Pl.'s Dep. at 61).

Plaintiff has proposed no evidence, other than his conclusory statement that he was cut because the officers were not manning the metal detector at all times, and inmates who went to the yard in the afternoon were not scanned, allowing them to bring

---

[8] It appears that inmates did not often go straight from their cells to the yard. Instead, they went to the mess hall to eat and then went to their recreation period in the yard.

[9] Plaintiff testified that "[o]nce in a while" his company would go through the metal detector. (Pl.'s Dep. at 57). It depended on how many companies the officers "ran before they [had] to go to their posts." *Id.* Plaintiff also acknowledged that because "it varied," he really did not know whether he was going to be required to go through the metal detector. (*Id.* at 59).

weapons into the yard.[10] Plaintiff is well-aware that inmates commit assaults with non-metal weapons and that they have ways of smuggling metal weapons into the yard even when the metal detectors are in use.[11]

The plaintiff in *Warren II* made the same argument. He was cut in the recreation yard at Green Haven Correctional Facility. Although the court found a substantial risk based upon the number of inmate-on-inmate attacks committed in the yard, the court also found that the defendants were not deliberately indifferent to the inmates' safety. The court in *Warren II* stated that plaintiff's "only argument that the defendants failed to act reasonably [was] that defendants failed to install metal detectors at the entrance to the recreation yard," but that there was no evidence "other than [plaintiff's] own conclusory statements to support the argument that the metal detectors would significantly reduce the risk to inmates of being assaulted by other inmates." 579 F. Supp. 2d at 496, 497. The court reasoned that "as Defendants point out, inmates can and do commit assaults with non-metal weapons and with their bodies and have other ways of getting weapons into the yards . . . ." *Id.* at 497. The court granted summary judgment in favor of the defendants. *Id.*

In *Hanna v. Vanguilder*, No. 9:08-CV-441, 2010 WL 1372385 (N.D.N.Y. Feb. 11, 2010), *Rep't Rec. adopted*, 2010 WL 1404276 (N.D.N.Y. Apr. 7, 2010), plaintiff challenged the defendants' "metal detector policy." *Id.* at *1-3. In *Hanna*, the facility

---

[10] As stated above, plaintiff did not mention this alleged failure by the officers until he appealed his grievance to the CORC.

[11] A review of the discovery documents also shows that a great many of the unusual incidents in the yard occurred during the evening hours, when plaintiff claims the inmates were once again required to go through the metal detector.

also had metal detectors, but the metal detector was not used on weekends when the facility was understaffed. *Id.* at *1. When the metal detector was not in use, staff relied upon random pat frisks. *Id.* Hanna, who felt no fear or threat, was stabbed by an unknown assailant in an area of the yard that was difficult to observe. *Id.* at *2. Hanna stated that his assailant "'came out of nowhere . . . .'" *Id.* As a result of the attack, Hanna received thirty-two stitches. *Id.*

The court in *Hanna* discussed evidence of inmate-on-inmate attacks that occurred in the facility in the month prior to the attack on Mr. Hanna, finding that only two of the seven attacks took place in the yard, and they were during evening recreation periods when inmates were required to pass through the metal detectors. *Id.* at *2, 7. The court cited one of the affidavits submitted with the motion for summary judgment, which stated that metal detectors and pat frisks would not have detected weapons that were secreted in the mouth or in body cavities, and officers were not authorized to conduct body cavity searches in the absence of probable cause. *Id.* at *1.

The court analyzed the case under the failure to protect standard. The court found that Hanna offered no evidence to satisfy the subjective prong of the test. *Id.* at *6. Hanna claimed that because a violent attack had occurred in the yard, the defendants should "always have been using the metal detectors." *Id.* at *7. The court found Hanna's claim "unavailing." *Id.* (citing *Warren I*, 476 F. Supp. 2d 407, 411 (S.D.N.Y. 2007)). The court in *Hanna* found that while only using the metal detectors during the week was "arguably wrong or even negligent, this does not rise to the level of deliberate indifference actionable under the Eighth Amendment." *Id.* at *7. The

18

court cited *Warren II*, for the proposition that even if the official is aware of the risk, he may be found "free of liability" if he responds "reasonably to the risk, even if the harm ultimately was not averted." *Id.* (citing *Warren II*, 579 F. Supp. 2d at 496).

The same is true in this case. The investigation into plaintiff's grievance by the IGRC resulted in a report, stating that "[i]nmates are run through a metal detector and pat frisked during yard runs. There is no way to ensure that there will not be any fighting between inmates in the yard without a complete lockdown of the facility." (Def.s' Ex. A at 3). There clearly were security procedures in place, and plaintiff's conclusory statement that he was cut by a metallic object, that was smuggled into the yard when the metal detector was not being used, and that the risk to him would have been significantly reduced if the metal detectors were used at all times, is also "unavailing."[12] It is also clear that plaintiff concedes that there are other security measures, such as visual observation and pat frisks when inmates go to, or are being observed in the yard.[13] Finally, there is no way to know that plaintiff was assaulted with a metal weapon that would have been discovered if a metal detector was used. Even if plaintiff was cut by a metal weapon, there is no way to know that it was smuggled into the yard in a way that would have evaded the metal detector.

Defendants have shown that there are no questions of material fact, and plaintiff has not met his burden in opposing the summary judgment motion to come forward

---

[12] The court is assuming only for purposes of this Recommendation that plaintiff is correct, and that the guards close down the metal detector to go to other posts.

[13] In addition, as stated above, a review of the discovery documents produced for plaintiff shows that many of the attacks occurred during times that plaintiff concedes the metal detectors were in use.

with specific facts, showing that there is a genuine issue for trial.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Clerk file **UNDER SEAL** the redacted discovery materials that were provided to plaintiff as the result of his motion to compel (Dkt. No. 35), and it is

**RECOMMENDED**, that defendants' motion to for summary judgment (Dkt. No. 38 be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 30, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge